

# ARKANSAS COURT OF APPEALS

DIVISION II
No. CV–17–30

MELISSA HUNDLEY HAYS

APPELLANT

V.

JASON LEE HAYS

APPELLEE

**OPINION DELIVERED:** SEPTEMBER 13, 2017

APPEAL FROM THE FAULKNER COUNTY CIRCUIT COURT
[NO. 23DR-16-282]

HONORABLE DAVID M. CLARK, JUDGE

AFFIRMED

---

**ROBERT J. GLADWIN, Judge**

The Faulkner County Circuit Court issued a divorce decree on October 21, 2016, denying permanent alimony to appellant Melissa Hundley Hays. On appeal, Melissa argues that the trial court abused its discretion by applying a public-policy argument to deny her request for permanent alimony. We affirm.

Appellee Jason Lee Hays and Melissa married on April 26, 2009, and no children were born of the marriage. Jason filed for divorce on March 17, 2016, and Melissa counterclaimed for separate maintenance, alleging that she was disabled, unable to work, and had not worked during their marriage. Melissa sought temporary and permanent alimony, and she later amended her counterclaim to ask for a divorce. At the divorce trial, the parties stipulated that Melissa would be granted the divorce on her amended counterclaim, and Jason waived corroboration of grounds. The parties further stipulated that the home in which they had lived was Melissa's premarital property.

Janet Lee Hundley, Melissa's mother, testified that her daughter is thirty-six years old and previously had only two short-term jobs, at Walmart and a veterinarian's clinic, but she had not worked since she married Jason. Ms. Hundley said that Melissa and Jason had been together for seventeen years but had been married for only seven years. She said that Melissa is a visual learner and has an "information processing malfunction." She said that when Melissa gets upset or gets "thrown" about something, she "just shuts down. She cannot function. She suffers from severe anxiety." She said that Jason knew about Melissa's disabilities, and she had explained to him that when Melissa mixes up her sentences, it is because of her learning style. She said that Melissa had done some light filing and copying under supervision for the family firm; however, she said that these skills would not translate into real-world jobs.

Ms. Hundley said that Melissa does not drink but that Jason does. Ms. Hundley said that Melissa takes medication for anxiety and that there were times, when Melissa and Jason were fighting, that she believed Melissa had overmedicated herself. She claimed that she had not seen this since Melissa and Jason had separated.

Ms. Hundley said that Jason had a new vehicle that he had purchased by trading in a truck that had been a gift to Melissa from her and her husband. She also described the condition of Melissa's home when Jason left: it had paint all over the ceiling and carpet where Jason had begun to paint; there were holes in the wall; the cabinet doors were loose; electrical covers were broken; the dishwasher had no door; and there was only cold water connected to the washer.

SLIP OPINION

On cross-examination, Ms. Hundley said that Melissa could drive and that she had passed a driver's test when she was seventeen. Melissa had gone to college for a year but could not make her "grades," even with her mother's tutoring. Ms. Hundley had not witnessed Melissa overmedicating since her separation from Jason, but she admitted that she had not been with Melissa all the time. She also said that Jason had emailed her about concerns he had regarding Melissa's overmedication. Jason had specifically asked Ms. Hundley to help him with this more than once. However, she said that she does not believe Melissa has a problem overusing prescription medications anymore. She admitted to having asked Jason in a 2015 email to hide Melissa's pills.

Ms. Hundley said that Jason had paid the mortgage payments on Melissa's house but had not kept the house in good repair. She also said that because of her health issues, Melissa spent her time playing video games, watching movies, and cleaning her house. She thought Melissa spent two or three hours per day playing video games. She said that Melissa drove her car for grocery shopping, getting to Little Rock, or going to the doctor. She said that she trusted Melissa to deal with her doctors and to take her medications. She said that Jason would not go to couple's counseling with Melissa in 2014, when Jason had filed for divorce the first time. After they had reconciled, Jason promised to be calmer with Melissa, and Melissa promised to find a job. She said that she had helped Melissa fill out application forms online, but Melissa could not find a job. She also had helped Melissa fill out a Social Security disability application, but Melissa's application was denied.

Jason testified that he had paid the mortgage on the house when he was living with Melissa. He also admitted that he had caused the damage to the home depicted in

photographs presented as evidence. He said that he knew of Melissa's information-processing problem and had seen the effects of it. He said that when they had a conversation about uncomfortable things, Melissa would shut down. He said that Melissa has trouble getting her point across and she mixes her words up in her sentences. He claimed that Melissa had always had these problems but that they had worsened.

Before he married Melissa in 2009, he had been with her for twelve years. He was aware of her two small jobs and that they had not lasted. He said that Melissa had agreed to get a job after they married in 2009. However, from the time they were married, Melissa had never worked. He said that he thought Melissa could be a stocker at Kroger and that she wanted a job where she did not have to deal with people and could work on her own. He thought that she presented well and that someone would hire her.

Jason said that he drank to excess sometimes and that Melissa did not drink. He said that he has a girlfriend named Susan Lambert, who is unemployed, and that he does not support her. He said that Melissa was covered by health insurance through his employer. He agreed that he had contributed more than $2000 a month to Melissa before June 2016. However, he said that he had resisted paying spousal support because he thought Melissa needed to have something to do, and if he continued "to feed that," he was worried for her health and safety. Jason said that he worked as a conductor for Amtrak and suffered from PTSD because a girl had stepped in front of his train while he was training as an engineer. He also had injured his arm in April 2015 and was off work for seven and a half months. Recently, he had been working two jobs to cover for another conductor, so he had been able to contribute more to Melissa. He thought that if Melissa could get a job, she could

support herself. He paid $10,000 down on his new truck by trading in the 2013 truck he had owned with Melissa. They got the 2013 truck by trading in her truck to make the $1000 down payment. He owed $28,000 on his new vehicle.

On cross-examination, Jason said that Melissa played Pictionary and Trivial Pursuit and that she played video games that required complex thought. He said that these games took dexterity and that she was better at them than he. Because of this, he thought she could hold down a menial or higher-than-menial job. He had not seen any effort by Melissa in the last four to five years to get a job. He said that Melissa did not drink but did become intoxicated several times a week when she took her medication. He said that he had contributed money for Melissa's care during separation because he had not wanted her to struggle. He tried to keep Melissa's bank account balance at $1000.

Melissa testified that Jason had been abusive by putting his hand on her and holding her to the ground. She had not worked since marrying Jason except to help her mother a little. She said that when they married, Jason told her he would take care of her and that she did not have to work. She said that she had difficulty communicating with people and understanding them. She had difficulty even getting on the phone. When Jason yelled at her, or if she did not understand something, she "just fold[ed]."

Melissa said that she saw a pain specialist for migraines and a psychiatrist for anxiety and depression. She said that she took naproxen for arthritis in her hands and hydrocodone for headaches. Her psychiatrist had prescribed clonazepam and Zoloft. She said that when she had been with Jason, it may have looked like she was medicated, but she had been

depressed and "just falling apart." When he left, she was "so much better and did not feel like [she] was out of it."

Melissa said that she had played video games to escape from Jason's abuse and it helped with her visual processing. She also cleaned her house, worked in the yard, and had applied for jobs at Target and Walmart. She had a high school diploma and a year and a half in college, where she struggled. She had no specialized training and zero income, and she was denied Social Security disability. She said it would cost $4000 to $7000 to repair her home. She also introduced a video containing a conversation between her and Jason in which he kept repeating, "Apply for a job."

Melissa testified on cross-examination that she was asking for $1800 a month in alimony for life. She said that she was seventeen years old when they began dating, and Jason was twenty-six. Jason moved in with her and her parents and began attending ITT; her parents paid for everything. She denied having a problem with prescription drugs. She said that she did not think she could work "right now" and that she could play video games but not for long because her fingers would hurt.

On re-direct examination, Jason said that he had counted Melissa's pills in the past and knew that she would run out of her pills two or three weeks before time to get a refill, especially the clonazepam. He said that she took so much that she lost track of days and would be in a slump and a stupor when he would get home. He said he had tried to get her to go to rehab, but she had no interest in it, and he thought that she would overdose and kill herself. He said he was not asking for any interest in the house that she owned with her parents and that the Duncan Law Firm was handling their case over the oil spill in

Mayflower. He also said that Melissa played video games in marathon sessions, five or six hours every day. He thought the pain in her hands was from holding the controller all day.

Regarding alimony, the trial court ruled from the bench as follows:

In doing my *Franklin* [*v. Franklin*, 25 Ark. App. 287, 758 S.W.2d 7 (1988)] analysis, I think what I want to do in discussing permanent alimony is to discuss what this case is not. It is not a case where one spouse has sacrificed their dreams and desires to provide for the other spouse to achieve their goals. No career was sacrificed; there are no children of the marriage.

The parties have not become accustomed to living a lavish lifestyle. This is not a case where one party suffers some catastrophic injury that precludes them from doing anything.

If I were to completely believe Melissa's version of events, then if this marriage had not occurred, she would still be living with her parents. If I believe her version of events and if I deny spousal support, she would walk away in the exact same position that she entered the marriage.

You have to look at this from a procedural or from a policy standpoint. If we were to burden a spouse to be completely obligated to support his ex-spouse for conditions that spouse had when they entered into the marriage, we discourage marriage. I don't know if "until death do us part" is still alive, but I want to still believe that everyone enters into marriage thinking that's what's going to happen. But if we are in a position that it is known that if you're marrying someone who has special needs and abilities and you're going to try to make that work but it doesn't work, when the marriage dissolves you're on the hook for life, it's going to be a disincentive for those people to find marriage. I mean that's something that will run through people's minds. So, I cannot find that this is a case in which permanent alimony is justified.

The trial court granted the divorce, divided the portion of retirement accrued as a marital asset, and made Jason responsible for his debt and for his truck. Melissa was granted judgment of $5000 for the marital property used as a trade-in on the new truck. The trial court then awarded "bridged" alimony. The trial court considered that Jason had made mortgage payments on the house owned by Melissa, giving her a $9000 improvement value. The trial court directed that Jason pay Melissa $300 per pay period (biweekly) for nine

months, after which the payment would drop to $200 per pay period for an additional two

months.

Melissa filed a timely notice of appeal, and this appeal followed. This court reviews

cases involving alimony under the applicable law as follows:

> Appeals of domestic-relations proceedings are reviewed de novo. *Wadley v. Wadley*, 2012 Ark. App. 208, at 2, 395 S.W.3d 411, 413. The decision to grant alimony lies within the sound discretion of the circuit court and will not be reversed on appeal, absent an abuse of discretion. *Taylor v. Taylor*, 369 Ark. 31, 34, 250 S.W.3d 232, 235 (2007). It should also be noted that the division of marital property and an award of alimony are complementary devices that a circuit court may employ to make the dissolution of the marriage financially equitable. *Webb v. Webb*, 2014 Ark. App. 697, at 3–4, 450 S.W.3d 265, 268–69. There can be no abuse of discretion, and a circuit court's decision regarding these issues cannot be overturned unless it can be demonstrated that it exercised its discretion improvidently or thoughtlessly without due consideration. *Smithson v. Smithson*, 2014 Ark. App. 340, 436 S.W.3d 491.

> An award of alimony is not mandatory but rather is discretionary, and the circuit court's decision regarding any such award will not be reversed on appeal absent an abuse of that discretion. *Smithson*, *supra*. This court has recognized that a circuit court is in the best position to view the needs of the parties in connection with an alimony award. *Id*. The purpose of alimony is to rectify the economic imbalance in the earning power and standard of living of the divorcing parties, in light of the particular facts of each case. *Id*. The primary factors are the financial need of one spouse and the other spouse's ability to pay, but other factors are the circumstances of the parties; the couple's past standard of living; the value of jointly owned property; the amount and nature of the income, both current and anticipated, of both parties; the extent and nature of the resources and assets of each party; the amount of each party's spendable income; the earning ability and capacity of both parties; the disposition of the homestead or jointly owned property; the condition of health and medical needs of the parties; and the duration of the marriage. *Id*. The need for flexibility outweighs the need for relative certainty in assessing alimony. *Id*. If alimony is awarded at all, it should be an amount that is reasonable under all the circumstances. *Id*.

*Beck v. Beck*, 2017 Ark. App. 311, at 8–9, 521 S.W.3d 543, 547–48 (quoting *Nelson v.*

*Nelson*, 2016 Ark. App. 416, at 6–7, 501 S.W.3d 875, 880).

Melissa argues that the trial court abused its discretion by applying a public-policy argument concerning marriage to disabled persons in order to justify refusal of a permanent alimony award. She contends that the trial court's decision was based on the court's wanting to prevent those who marry disabled persons in the future from being "on the hook" to support their disabled spouses, regardless of promises made and reliance on those promises and the passing of years.

Melissa emphasizes that the purpose of alimony is to rectify any economic imbalance in the earning power and standard of living of the parties in light of the particular facts of the case. *Taylor v. Taylor*, 369 Ark. 31, 250 S.W.3d 232 (2007). The primary factors to be considered are the financial need of one spouse and the ability of the other spouse to pay. *Foster v. Foster*, 2016 Ark. 456, 506 S.W.3d 808; *Jones v. Jones*, 2014 Ark. App. 614, 447 S.W.3d 599. Melissa also cites *Franklin, supra*, mentioned in the trial court's ruling from the bench, which lists possible factors for courts to consider in the award of alimony:

> Among [the factors] are the financial circumstances of both parties, the financial needs and obligations of both the couple's past standard of living, the value of jointly owned property, the amount and nature of the income, both current and anticipated, of both husband and wife, the extent and nature of the resources and assets of each that is "spendable," the amounts which, after entry of the decree, will be available to each of the parties for the payment of living expenses, the earning ability and capacity of both husband and wife, property awarded or given to one of the parties, either by the court or the other party, the disposition made of the homestead or jointly owned property, the condition of health and medical needs of both husband and wife, the relative fault of the parties and their conduct, both before and after separation, in relation to the marital status, to each other and to the property of one or the other or both, the duration of the marriage and even the amount of child support.

*Franklin*, 25 Ark. App. at 290–91, 758 S.W.2d at 8 (quoting *Boyles v. Boyles*, 268 Ark. 120, 124–25, 594 S.W.2d 17, 20 (1980)). However, Melissa contends that these are secondary

factors, and the primary factors are the financial needs of one spouse and the other spouse's ability to pay. *Foster, supra.*

Melissa argues that Jason demonstrated that he was able to contribute $1000 to $2000 a month for her living expenses and that she has no independent income. She contends that he has the means to continue to support his disabled wife and that she sorely needs the support. She maintains that the secondary factors listed in *Franklin, supra,* support her position. Melissa argues that the trial court abused its discretion in making the alimony decision, and if the ruling were allowed to stand, it would be a true signal to all disabled persons that, if their spouses decide to abandon them in their need, the courts simply will not assist them. She maintains that the decision here was not made given the facts of this particular case; rather, the trial court applied a broad policy statement in the case of future marriages of the disabled.

In response, Jason claims that the trial court's order should be affirmed. We agree. In *Smithson v. Smithson*, 2014 Ark. App. 340, 436 S.W.3d 491, which contains similar facts to the case at bar, the trial court denied permanent alimony to the wife after a short marriage during which the wife did not work and had been granted Social Security disability benefits and the husband earned a good income. The trial court granted alimony of $1000 a month for one year. *Id.* On appeal, this court stated,

> A review of the overall distribution here evidences that appellant was awarded $10,000 cash from the nonmarital home's equity, appellant was awarded her marital portion of appellee's retirement and investment accounts, she was relieved of significant marital debt, appellee was ordered to pay half of appellant's accrued rental indebtedness and $2000 of appellant's attorney fees, and both parties were relatively young and were married a relatively short period of time. Rectification of economic imbalances is not necessarily appropriate when the marriage relationship did not influence the imbalances in earning capacity. *Evtimov v. Milanova*, 2009 Ark. App.

208, 300 S.W.3d 110. That appellee came into the marriage, and left the marriage, with significantly greater earning capacity does not automatically equate to a long-term sizable alimony award. An award of alimony, if one is awarded at all, is measured by the particular facts and circumstances of the parties before the trial court. We are not to substitute our judgment for that of the trial court; we are to determine only whether the alimony decision is reasonable under the circumstances. *Whitworth v. Whitworth*, 2009 Ark. App. 410, 319 S.W.3d 269. On the record presented for our de novo review, we are not left with a distinct and firm impression that a mistake was made in the award of alimony.

*Id.* at 8–9, 436 S.W.3d at 496–97.[1]

In *Evtimov*, *supra*, which was relied on by the *Smithson* court, this court affirmed the trial court's denial of alimony to the husband and rejected the husband's claim that the only consideration in determining whether to award alimony should be the difference in the parties' income and their future earning capacity. This court noted that the trial court had divided the wife's marital retirement asset and had made it a present distribution to the husband, as well as placing the marital debt on the wife, stating, "Alimony and property divisions are complementary devices that a trial judge employs to make the dissolution of a marriage as equitable as possible." *Id.* at 11, 300 S.W.3d at 117.

As the trial court noted, Melissa leaves the marriage in the same or better position than when she entered it. She gained an increase in the equity of her nonmarital house and remains, as she was upon entering the marriage, unemployed. Thus, as Jason contends, even though the trial court did consider its own public-policy reasoning—that a person should not be required to support a disabled ex-spouse for life when the disability predated the

---

[1]In contrast, see cases in which alimony was awarded because the marriage was the cause of the economic imbalance and earning capacity of the parties. *E.g.*, *Murphy v. Murphy*, 302 Ark. 157, 787 S.W.2d 684 (1990); *Stuart v. Stuart*, 2012 Ark. App. 458, 422 S.W.3d 147; *Hiett v. Hiett*, 86 Ark. App. 31, 158 S.W.3d 720 (2004); *Anderson v. Anderson*, 60 Ark. App. 221, 963 S.W.2d 604 (1998).

marriage because the requirement may discourage marriage—public policy was not the trial court's sole consideration. Further, even though we find no statute or caselaw to support this "so called" public policy, the trial court also stated in its decree that rehabilitative alimony was not appropriate because it did not appear that rehabilitation of Melissa's disability was likely. The trial court also considered that marital funds had been used to pay down the debt on Melissa's house and that she was retaining the $9000 benefit. Accordingly, even considering the trial court's unsupported public-policy reasoning, we hold that there was no abuse of discretion because the trial court did not act improvidently or thoughtlessly, without due consideration.

Affirmed.

VIRDEN and BROWN, JJ., agree.

*Satterfield Law Firm*, by: *Cynthia S. Moody*, for appellant.

*Debra J. Reece*, for appellee.