# IN THE SUPREME COURT OF IOWA

No. 21–0454

Submitted October 12, 2022—Filed December 16, 2022

**IN RE THE MARRIAGE OF JASON DALE MILLS AND ERINN ANN MILLS.**

Upon the Petition of **JASON DALE MILLS,**
    Appellee,

and Concerning **ERINN ANN MILLS** n/k/a **ERINN ANN PIERCE,**
    Appellant.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Wapello County, Shawn Showers, Judge.

A husband seeks further review of a court of appeals decision ordering traditional spousal support based on the wife becoming disabled during the marriage. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT ORDER AFFIRMED AS MODIFIED AND REMANDED.**

Oxley, J., delivered the opinion of the court, in which all participating justices joined. Christensen, C.J., and May, J., took no part in the consideration or decision of the case.

Ryan J. Mitchell of Orsborn, Mitchell, Goedken & Larson, P.C., Ottumwa, for appellant.

Heather M. Simplot of Harrison, Moreland, Webber & Simplot, P.C., Ottumwa, for appellee.

**OXLEY, Justice.**

A divorced husband challenges the award of spousal support to his former wife as ordered by the court of appeals. He contends the traditional spousal support award of $400 per month, and an increase to $1,000 per month upon the termination of his child support obligation, was inequitable, especially given the relatively short length of the parties' marriage. For the reasons explained below, we hold that a spouse's permanent disability acquired during the parties' marriage is an appropriate factor for consideration when determining a spousal support award, even when the length of the parties' marriage does not meet the usual durational threshold. With respect to the amount of spousal support awarded in this case, however, we conclude the court of appeals erred in increasing the award to $1,000 per month upon the termination of the former husband's child support obligation.

## I. Background Facts and Proceedings.

Jason and Erinn Mills married in May 2006. The parties welcomed the birth of their son later that same year. Prior to entering the marriage, Jason had obtained a bachelor's degree and was earning $40,899 per year at C&C Manufacturing. Although Erinn entered the marriage without a college education, she had obtained a phlebotomy certificate in 2005 and acquired part-time employment at a lab as a phlebotomist where she earned $7,024 the following year.

The parties signed a prenuptial agreement which generally provided their present and future property would remain separate, attaching a list of premarital

assets. Jason's premarital assets consisted of a 2002 Harley Davidson valued at $15,000, a 401(k)-retirement plan valued at $30,000,[1] a house valued at $38,500 with a $32,000 mortgage, and such miscellaneous items as posters of Bob Dylan and Jimi Hendrix and a Cheech & Chong album.

By comparison, Erinn's premarital assets were of much greater economic value, the most significant of which was an interest in her grandfather's trust—the J.O. Sheets Trust FBO Erinn Ann Pierce (Mills). Erinn received a distribution of $108,969.94 from that trust in 2008 and received the balance of her interest of $122,754.33 in 2013. Erinn and her brother also share remainder interests in another trust created by their grandfather, the J.O. Sheets Trust FBO JoAnne Pierce, created for the benefit of their mother. Although that trust was valued at $458,515 in 2006, Erinn's remainder interest remains subject to her mother's present interest. Aside from the trusts, the prenuptial agreement covered Erinn's four-acre farm she jointly owns with her mother, which includes a house, Morton building, and small barn. The property was valued at $140,000 with a $98,000 mortgage when the couple married.[2] Erinn used a portion of the trust proceeds she received during the marriage to pay off the mortgage and she invested the rest in various mutual funds, stocks, and securities, which were then transferred to her revocable trust.

---

[1]After the parties separated, Jason withdrew $83,782.36 from his IRA and used $30,000 of his withdrawal for a down payment on a home while taking out a loan for the remainder of the purchase price.

[2]Erinn's other premarital assets consisted of nine Arabian horses she jointly owned with her father (valued together at $100,000), horse-related gear valued at approximately $20,000, $25,000 in jewelry inherited from her grandmother, trophies from horse competitions, a $63,000 whole life insurance policy, and a $2,000 painting jointly owned with her brother.

Erinn was injured during the birth of the parties' only child in 2006, when she suffered a "rupture of the pubic symphysis," otherwise known as a rupture between two of her pelvic bones. As a specialist[3] explained it to Erinn, during delivery "the left side of [her] pelvis broke away from the right in the front, and in doing so, it rotated, and it ripped [the] muscles and tendons." This type of rupture causes muscle spasms that irritate and inflame the sciatic nerve. Following childbirth, Erinn was unable to dress herself, go to the bathroom, or walk without assistance. Erinn sought a second opinion at the Mayo Clinic a year later and received treatments that provided short-term relief. Erinn was told, however, that a permanent remedy, such as surgical repair, was not an option, and she was forced to live with the pain.

Erinn was determined to regain some normalcy in her life, resuming her work as a part-time phlebotomist approximately nine months after the childbirth injury. Maintaining a stable work schedule was difficult for Erinn as she was chronically late, and she explained that she "never knew from day to day getting up what [she] would feel like. So it just—it was very hard." According to Erinn, some days she would "wake up, and . . . literally have to roll onto the ground before [she could] stand up." Due to her constant pain and its effect on her ability to function, Erinn quit working in 2014. Erinn said this was a decision Jason encouraged, although he denies that claim. The most Erinn earned as a part-time phlebotomist was $10,000 per year.

---

[3]According to Erinn's testimony, the specialist also explained how her pain would vary between moderate to unbearable, and that "it would just be very sporadic in the depth of injury— the depth of pain that [she] would have."

Jason filed for divorce in 2019 after the parties separated in August of that year. Although the parties did not live an extravagant lifestyle, Jason paid for most, if not all, of the marital expenses after Erinn stopped working, and Erinn described herself as "basically completely dependent on Jason" since then. Prior to trial, the parties stipulated to temporary joint physical care of their child. Jason paid temporary child support payments of $428.35 per month, along with several of Erinn's expenses in lieu of spousal support, including an outstanding medical bill as well as her monthly car payment, car insurance, and utilities.

The district court conducted a two-day trial in February 2021. The parties agreed on the property settlement[4] and shared legal custody and physical care of their son, but disagreed on the issue of child support. Erinn also requested spousal support, but the parties disagreed as to its amount and duration.

At the time of trial, Jason was forty-six years old and Erinn was forty-two. They had been married for almost fifteen years. Jason remained employed at C&C Manufacturing as a product manager, where his income continued to rise during the marriage. Jason was earning $74,468.16 per year, or $49,962.12 after taxes. Erinn, on the other hand, was unemployed. She earned just under $9,000 in dividends from the J.O. Sheets Trust in 2019.

---

[4]For joint assets accumulated after the marriage the parties agreed, pursuant to the prenuptial agreement, that Erinn would receive her premarital four-acre farm, her 2015 Subaru Outback valued at $14,000, and a tractor Jason valued at $7,500. Jason received his 2012 Dodge Ram, which he owned outright, and all his personal property listed on exhibit 20 that was admitted at trial. Jason further agreed to pay a credit card in his name in the amount of $7,643.73, and received the home, and its debt, that he purchased following the parties' separation.

Much of Jason's evidence at trial focused on the wealth of Erinn's family. For example, he testified that Erinn's family would never let her want for anything and have always supported her financially and that Erinn would eventually receive money from her father's estate (even though Erinn's mother was the estate's sole beneficiary). Jason also pointed out Erinn's remainder interest in the J.O. Sheets Trust, as well as her own revocable trust, which was valued at $142,077.17 at the time of trial. Jason also believed that Erinn was capable of working and pointed to her ability to care for horses on her four-acre farm.

Erinn testified that she received between $200 and $320 per month in dividends from her revocable trust. She also explained that although she had boarded her father's Arabian show horses over the years, her injuries limited the type of care she could provide them. And by 2019, after her father had stopped showing horses, she was no longer boarding them. Before that, she had earned income from boarding her father's horses totaling $6,400 in 2016, $5,200 in 2017, and $3,600 in 2018.

Erin further testified about her constant and "debilitating" pain from her disability and its impact on her ability to maintain employment. Erinn explained she could not return to work "[b]ecause . . . it's too hard . . . to be in one position too much. It hurts to sit too long. It hurts to stand too long. It hurts to walk too much." Erinn's physician also testified that Erinn is unable to work in any capacity due to her chronic pain from the childbirth injury. According to the physician, there was "zero" likelihood of Erinn's injury improving.

The district court expressly found credible Erinn's testimony "that she is currently unable to work because of the pain" from the ruptured pelvis she suffered in 2006. Implicit in the district court's finding that her continuing pain made her unable to work fourteen years after the injury is the conclusion that she had been, and continued to be, disabled. Erinn's credible testimony, coupled with her physician's testimony that her injury would not improve, supports a conclusion that Erinn is permanently disabled.

Erinn requested $2,000 per month in spousal support in addition to Jason making her monthly vehicle payment of $460. Jason countered that he would assume responsibility for the $10,643.58 debt owed on Erinn's vehicle if he was not ordered to pay her spousal support. Erinn testified that without spousal support she would be forced to rely solely on the funds from her revocable trust, which would soon be depleted.

Although the district court found Erinn's testimony regarding her inability to work credible, it relied on a number of factors to conclude she was not entitled to any type of spousal support. These included Erinn's interests in both her own revocable trust as well as the J.O. Sheets Trust, the parties' distribution of property and shared physical care of their son, the likelihood of Erinn either qualifying for disability benefits[5] or seeking employment, Jason's obligation to pay the balance of the marital debt, and the parties' marriage lasting only fifteen years. The district court considered only Erinn's investment income for purposes

---

[5]At the time of trial, Erinn was in the process of applying for Social Security disability benefits. Whether she qualified, and in what amount, is not in the record.

of the child support calculations and increased Jason's child support obligation from the temporary amount of $428 per month to $613.25 per month.

Erinn appealed, and we transferred the case to the court of appeals. The court of appeals reversed the district court's decision not to award any spousal support and awarded Erinn traditional spousal support in light of her disability and Jason's ability to pay. The court of appeals concluded Erinn was entitled to $400 per month, which should then increase to $1,000 per month upon the termination of Jason's child support obligation.

We granted Jason's application for further review to determine whether the fact that one spouse acquires a permanent disability during the marriage can support a spousal support award when the length of the marriage would not otherwise support a traditional support award under usual standards.

**II. Scope of Review.**

This case arises in equity and is therefore reviewed de novo. Iowa R. App. P. 6.907; *see also In re Marriage of Pazhoor*, 971 N.W.2d 530, 537 (Iowa 2022) ("Our review of alimony awards is de novo."). "We examine the entire record and adjudicate anew rights on the issues properly presented." *In re Marriage of Beecher*, 582 N.W.2d 510, 512–13 (Iowa 1998) (citing *In re Marriage of White*, 537 N.W.2d 744, 746 (Iowa 1995)).

Although we review claims related to spousal support de novo, "we have emphasized that 'we accord the trial court considerable latitude.' " *In re Marriage of Gust*, 858 N.W.2d 402, 406 (Iowa 2015) (quoting *In re Marriage of Olson*, 705 N.W.2d 312, 315 (Iowa 2005)); *see also In re Marriage of Schenkelberg*,

824 N.W.2d 481, 486 (Iowa 2012). The trial court's order will only be disturbed "when there has been a failure to do equity." *Gust*, 858 N.W.2d at 406 (quoting *Olson*, 705 N.W.2d at 315).

### III. Analysis.

We first address whether Erinn's disability entitles her to an award of traditional spousal support. Considering the governing statute, our cases construing it, and how other jurisdictions have addressed the effect of a spouse's disability on spousal support, we conclude Erinn's disability warranted an award of traditional support.

"Alimony is an allowance to the spouse in lieu of the legal obligation for support." *In re Marriage of Sjulin*, 431 N.W.2d 773, 775 (Iowa 1988). Spousal support is not an absolute right; rather, its allowance is determined based on the particular circumstances presented in each case. *In re Marriage of Dieger*, 584 N.W.2d 567, 570 (Iowa Ct. App. 1998).

We start with the statutory criteria. *Gust*, 858 N.W.2d at 407. Pursuant to Iowa Code section 598.21A(1) (2019),

> the court may grant an order requiring support payments to either party for a limited or indefinite length of time after considering all of the following:
>
> *a.* The length of the marriage.
>
> *b.* The age and physical and emotional health of the parties.
>
> *c.* The distribution of property made pursuant to section 598.21.
>
> *d.* The educational level of each party at the time of marriage and at the time the action is commenced.

*e.* The earning capacity of the party seeking maintenance, including educational background, training, employment skills, work experience, length of absence from the job market, responsibilities for children under either an award of custody or physical care, and the time and expense necessary to acquire sufficient education or training to enable the party to find appropriate employment.

*f.* The feasibility of the party seeking maintenance becoming self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage, and the length of time necessary to achieve this goal.

*g.* The tax consequences to each party.

*h.* Any mutual agreement made by the parties concerning financial or service contributions by one party with the expectation of future reciprocation or compensation by the other party.

*i.* The provisions of an antenuptial agreement.

*j.* Other factors the court may determine to be relevant in an individual case.

The precise "amount and duration" of a spousal support award will vary "according to the purpose it is designed to serve." *In re Marriage of Hettinga*, 574 N.W.2d 920, 922 (Iowa Ct. App. 1997) (en banc) (citing *In re Marriage of Francis*, 442 N.W.2d 59, 62 (Iowa 1989) (en banc)).

This case involves traditional spousal support. "The purpose of a traditional or permanent alimony award is to provide the receiving spouse with support comparable to what he or she would receive if the marriage continued." *Hettinga*, 574 N.W.2d at 922. In accordance with this purpose, therefore, "[t]raditional or permanent alimony is usually payable for life or for so long as the dependent is incapable of self-support." *Id.* (citing *Francis*, 442 N.W.2d at 62).

When one spouse suffers a disability through the course of marriage that renders the spouse unable to continue employment, our court of appeals has often considered the spouse's disability as a factor in determining whether an award of spousal support is appropriate. *See, e.g., In re Marriage of Norman*, No. 20–0692, 2021 WL 815889, at *2 (Iowa Ct. App. Mar. 3, 2021) (unpublished) ("The earnings disparity together with [payee]'s inability to undertake gainful employment supported the spousal support award."); *Hettinga*, 574 N.W.2d at 922 (noting payee's "disability render[ed] her incapable of self-support now or in the future," making "[h]er need for alimony . . . absolute"); *In re Marriage of Kurtt*, 561 N.W.2d 385, 388 (Iowa Ct. App. 1997) (affirming a spousal support award based on payee's disability); *In re Marriage of Paxson*, 491 N.W.2d 175, 177 (Iowa Ct. App. 1992) (affirming a spousal support award based on payee's lack of "earning capacity due to her disability"); *cf. In re Marriage of Gutcher*, No. 17–0593, 2018 WL 5292082, at *3–5 (Iowa Ct. App. Nov. 7, 2018) (unpublished) (considering fifty-nine-year-old spouse's disability as part of spousal support analysis, but declining to award support noting both spouses had been previously married and "thirteen years falls well short of the durational threshold").

In *In re Marriage of Aronson*, for example, the Iowa Court of Appeals found a former wife's permanent disability warranted an increase in her traditional support award from $300 to $900. No. 05–0373, 2006 WL 334250, at *4 (Iowa Ct. App. Feb. 15, 2006) (unpublished). During the parties' approximately twenty-five-year marriage, the former wife "was diagnosed as having a major depressive

disorder," which resulted in several hospitalizations following her diagnosis. *Id.* at *2. Apart from this disorder, the former wife "also suffer[ed] from several physical health concerns," including "hypothyroidism, hip and knee problems related to arthritis, high blood pressure, and neck problems." *Id.* The court noted the former wife's "health issues prevent[ed] her from working in a position that would allow her to be self-supporting at th[at] time or in the foreseeable future." *Id.* at *4. The former wife's circumstances thus stood in contrast to that of the former husband, who "ha[d] a substantially greater earning capacity than" the former wife, "earn[ed] over $50,000 per year, [was] in good health, and apparently [would] continue to have a capacity to earn this much or more into the foreseeable future." *Id.*

Similarly, in *In re Marriage of Walker*, the Iowa Court of Appeals affirmed a district court's award of traditional support to a former wife who became permanently disabled during the marriage as a result of "degenerative disc disease, bulging disc disease, and spurring on her vertebrae." No. 13–1310, 2014 WL 4937727, at *1, *7–8 (Iowa Ct. App. Oct. 1, 2014) (unpublished). In finding that permanent spousal support was appropriate, even though the parties were married for less than eleven years, the court noted "when the parties married in 2002, [the former wife] was not disabled. She leaves the marriage disabled and with little earning capacity." *Id.* at *7. Therefore, under its review of the record and analysis of the section 598.21A factors, the court concluded the former wife's "disability weigh[ed] heavily in [its] determination to affirm the alimony award." *Id.* at *9.

The court of appeals' analysis in these cases is in line with courts from other jurisdictions, which similarly treat a spouse's disability acquired during the marriage as a factor for consideration when determining spousal support. *See, e.g.*, *Dollar v. Dollar*, 203 So. 3d 108, 111–12 (Ala. Civ. App. 2016) (per curiam); *Kruse v. Levesque*, 192 So. 3d 1263, 1267–68 (Fla. Dist. Ct. App. 2016); *Hinson v. Hinson*, 535 S.E.2d 143, 143–44 (S.C. Ct. App. 2000) (per curiam).

In *Kruse v. Levesque*, for example, Florida's Second District Court of Appeal reversed a trial court's decision to award the former disabled wife durational, as opposed to permanent,[6] support. 192 So. 3d at 1267–68. The parties were married for eleven years, and although the former wife had a psychology degree and earned "approximately $25,000 annually," she suffered from disabilities throughout the marriage (including fibromyalgia and back problems) that rendered her unable to work in any capacity. *Id.* at 1264. Following her disability, the former wife began receiving $880 per month in disability payments. *Id.* at 1264–65. At trial, both the former wife's treating physician and a vocational rehabilitation counselor testified regarding the impact of her disability on her ability to be regularly employed. *Id.* at 1265. On appeal, the court held that "an award of permanent instead of durational alimony was appropriate because the Former Wife demonstrated by clear and convincing

---

[6]Under Florida law, permanent alimony is strikingly similar to what is recognized in Iowa as traditional spousal support. *See* Fla. Stat. § 61.08(8) (2022) ("Permanent alimony may be awarded to provide for the needs and necessities of life as they were established during the marriage of the parties for a party who lacks the financial ability to meet his or her needs and necessities of life following a dissolution of marriage.").

evidence that she lacked the financial ability to meet her needs and the necessities of life following the dissolution of the marriage." *Id.* at 1267.

Similarly, in *Dollar v. Dollar*, the Alabama Court of Civil Appeals held a trial court abused its discretion in limiting a former wife's periodic support[7] award of $1,000 per month to only sixty months. 203 So. 3d at 112. The former wife was diagnosed with "cervical and focal dystonia"—a permanent disability—during the parties' marriage, which prevented her from maintaining employment. *Id.* at 111. In reaching its decision, the court noted "there [was] no testimony . . . indicating that the wife [was] capable of working, and there was no finding by the trial court that could lead to such a determination." *Id.* at 112. After an examination of all the evidence, therefore, the court

> conclude[d] that the wife showed a need for periodic alimony that is not likely to abate in the future, that the husband's ability to pay periodic alimony is clear from the testimony presented, and that no equitable considerations would counsel in favor of the time limitation imposed upon the trial court's periodic-alimony award.

*Id.*

It also appears that courts in other jurisdictions differentiate between disabilities acquired during a marriage compared to disabilities that existed prior to a marriage. *See, e.g., Hays v. Hays*, 526 S.W.3d 907, 913–15 (Ark. Ct. App.

---

[7]Periodic spousal support closely resembles a mix between Iowa's transitional and traditional spousal support. *See TenEyck v. TenEyck*, 885 So. 2d 146, 151–52 (Ala. Civ. App. 2003) ("Periodic alimony . . . 'is an allowance for the future support of the [recipient spouse] payable from the current earnings of the [paying spouse].' " (alterations in original) (quoting *Hager v. Hager*, 299 So. 2d 743, 750 (Ala. 1974))). The purpose of periodic support "is to support the former dependent spouse and enable that spouse, *to the extent possible*, to maintain the status that the parties had enjoyed during the marriage, until that spouse is self-supporting or maintaining a lifestyle or status similar to the one enjoyed during the marriage." *Id.* at 152 (quoting *O'Neal v. O'Neal*, 678 So. 2d 161, 164 (Ala. Civ. App. 1996)).

2017) (holding the trial court's application of public policy reasoning to deny permanent spousal support to a former wife, who entered the marriage intellectually disabled and unemployed, was not an abuse of discretion).

The length of the marriage does not necessarily foreclose consideration of Erinn's disability in awarding traditional support. The Mills were married for fourteen years. "Generally speaking, marriages lasting twenty or more years commonly cross the durational threshold and merit serious consideration for traditional spousal support." *Gust*, 858 N.W.2d at 410–11; *see also In re Marriage of Geil*, 509 N.W.2d 738, 742 (Iowa 1993) (almost nineteen years). "[H]owever, that is not required." *Pazhoor*, 971 N.W.2d at 543 (affirming hybrid award of traditional and rehabilitative support following seventeen-year marriage). Traditional support has been awarded in marriages shorter than twenty years. *See, e.g.*, *Schenkelberg*, 824 N.W.2d at 486 (sixteen years); *In re Marriage of Witherly*, 867 N.W.2d 856, 857, 860 (Iowa Ct. App. 2015) (seventeen years). While the length of the marriage is an important consideration in awarding traditional support, it is not the only consideration under our statutory framework. *See* Iowa Code § 598.21A(1).

"The goal in awarding alimony is to do equity." *Pazhoor*, 971 N.W.2d at 541; *see also* Iowa Code § 598.3 ("An action for dissolution of marriage shall be by equitable proceedings . . . ."); *In re Marriage of Mauer*, 874 N.W.2d 103, 107 (Iowa 2016) (noting the general assembly "has instructed courts to equitably award spousal support by considering each of the [statutory] criteria"); *Geil*, 509 N.W.2d at 742 (holding the spousal support award "was an appropriate

means of remedying the financial inequity created by the dissolution"). When one spouse enters the marriage in good health and with an established earning capacity, then suffers a permanent disability during the marriage that renders the spouse unable to work and impacts the spouse's ability to be self-sufficient, considering the spouse's disability when determining a spousal support award helps ensure that resulting financial inequities may be remedied. *See Geil*, 509 N.W.2d at 742 ("Alimony may be used to remedy inequities in a marriage and to compensate a spouse who leaves the marriage at a financial disadvantage."). We therefore hold a spouse's disability suffered during the parties' marriage is an appropriate consideration when determining an award of traditional spousal support. We emphasize, however, that only disabilities that substantially reduce a spouse's earning capacity and feasibility of self-support, *see* Iowa Code § 598.21A(1)(*f*), will generally warrant consideration in the determination of whether to award traditional support.

Turning to the facts of this case, the district court concluded Erinn's continuing pain from her permanent injury prevented her from working, which made her incapable of gainful employment, i.e., unable "to become self-sufficient at 'a standard of living reasonably comparable to that enjoyed during the marriage.' " *Gust*, 858 N.W.2d at 411 (quoting Iowa Code § 598.21A(1)(*f*)). In addition, Erinn has established a need for, and Jason has the ability to pay, a traditional support award. *See In re Marriage of Wendell*, 581 N.W.2d 197, 201 (Iowa Ct. App. 1998) ("The imposition and length of an award of traditional alimony is primarily predicated on need and ability."). Considering Erinn's

request for $2,000 per month and Jason's request to pay $0 per month, we agree with the court of appeals' award in the amount of $400 per month based on its detailed review of the record, including: the property distribution, which gave Erinn her unencumbered four-acre farm and her revocable trust with income-producing investments worth close to $140,000, *see In re Marriage of Christensen*, 543 N.W.2d 915, 919 (Iowa Ct. App. 1995) ("We find Sandy's enhanced property distribution from her antenuptial agreement diminishes her need for short-term rehabilitative alimony."); *In re Marriage of Weiss*, 496 N.W.2d 785, 788 (Iowa Ct. App. 1992) (considering larger property division awarded to the spouse requesting support, including gifted or inherited property, in determining whether to award spousal support); the allocation of marital debt to Jason, including the monthly payment for Erinn's vehicle, *see In re Marriage of Anliker*, 694 N.W.2d 535, 541–42 (Iowa 2005) (awarding payee spouse $1,250 in traditional support even though payor spouse was assigned $34,356 of the marital debt and payee spouse only assumed $5,633 of the debt); and their relative earning capacities, particularly Jason's stable employment and steadily increasing pay juxtaposed against Erinn's inability to engage in gainful employment due to her permanent disability.

Certain factors may weigh against an award of spousal support in this case, including the length of the parties' marriage and their relatively young ages. Nonetheless, based on Erinn's permanent disability and lack of earning capacity, an award of traditional spousal support is necessary to ensure equity is served between the parties. Special attention should also be given to the fact that

Erinn's disability was directly caused by the birth of her and Jason's only child; a significant contribution, we think, to the parties' marriage.

While we agree that Erinn is entitled to an award of traditional spousal support and that the court of appeals settled on an appropriate amount at $400 per month, we conclude that the court of appeals erred in increasing Erinn's monthly support payment to $1,000 upon the termination of Jason's child support obligation. "[C]hild support and alimony or spousal support are separate and distinct." *In re Marriage of Ludwig*, 478 N.W.2d 416, 419 (Iowa Ct. App. 1991); *see also Sjulin*, 431 N.W.2d at 775 ("The term alimony usually and technically means an allowance for spousal support and is distinguishable from property division and child support."). Other jurisdictions similarly treat spousal support and child support as separate matters for the court to decide. *See, e.g.*, *Fink v. Fink*, 462 S.E.2d 844, 851 (N.C. Ct. App. 1995) ("We recognize that '[a]limony is payment for support of a former spouse and child support is payment for support of a minor child[,] . . . [and] the two must be kept separate when the court determines the appropriate awards as to each[,] the distinction between the two kinds of payments is easily blurred, particularly when the child for whom the support is needed resides primarily with the recipient of the alimony.' " (alterations and omission in original) (quoting *Wolfburg v. Wolfburg*, 606 A.2d 48, 52 (Conn. App. Ct. 1992))).

In increasing Erinn's spousal support award from $400 per month to $1,000 per month upon the termination of Jason's child support obligation, the court of appeals relied on this court's decision in *In re Marriage of Gust*, 858

N.W.2d 402, with little additional analysis. *Gust*, however, does not stand for the proposition that spousal support should routinely increase when the child support obligation terminates. Factually, it is true that the spousal support awarded by the district court in *Gust* was increased when child support ended, from $1,400 per month to $2,000 per month. *Id.* at 404. But the issues on appeal dealt only with the parties' disagreement over whether the amount should be $2,000 per month or $1,000 per month and the length of the award with respect to retirement, not whether the spousal support award should or should not increase when the child support obligation ended. *Id.* at 414–15.

In a particular case, a child support obligation could affect the paying spouse's ability to pay a spousal support award sufficient to meet the receiving spouse's needs, such that a spousal support award should be adjusted once a child support obligation terminates. But that is by no means automatic, and any reading of *Gust* to that effect is in error. The facts in this case do not support an increase in spousal support. The parties' property settlement favored Erinn. She not only received significantly more property, including income-producing property, but also left the marriage without a mortgage or a car payment, which makes her monthly needs relatively smaller. This is not to say, however, that the termination of child support can never result in an increase in spousal support. Rather, if such an increase is made, it should be supported by an explanation of what justified the increase, *see, e.g., Stock v. Stock*, 873 N.W.2d 38, 47 (N.D. 2016) (affirming an increase from $3,000 per month to $5,500 per month in spousal support award upon termination of child support obligation, but

cautioning courts from "elevating the support amount without proper explanation"), which the court of appeals did not provide in this case. We see no justification to increase Erinn's spousal support award and conclude it should remain at $400 per month upon the termination of Jason's child support obligation.

With respect to the duration of the spousal support award, we reject Jason's argument that Erinn's circumstances make an award of transitional, as opposed to traditional, support more appropriate. Just last term, we formally recognized transitional spousal support as a fourth form of spousal support in Iowa. *See Pazhoor*, 971 N.W.2d at 545. We explained that:

> transitional alimony is appropriate when a party *capable of self-support* nevertheless needs short-term financial assistance to transition from married to single life. Transitional alimony is not needed when the recipient has sufficient income or liquid assets to facilitate the change to single life. We decline to require a showing of undue hardship and instead rely on district courts to do equity when awarding transitional alimony to "bridge the gap" from married to single life.

*Id.* (emphasis added). Transitional support is intended to resolve a short-term liquidity crunch as one party transitions from married life to single life. *Id.* Generally, transitional support can be addressed through the issuance of orders on temporary matters while the dissolution proceeding is pending. But if additional relief is still necessary to assist in that transition, it should be of a short duration.

Erinn and Jason's marriage is not an appropriate candidate for transitional spousal support. This is not a situation where the parties are simply transitioning from a combined unit to separate units and one spouse needs

temporary financial assistance while making that shift. *See In re Marriage of Mann,* 943 N.W.2d 15, 23 (Iowa 2020) ("[T]ransitional alimony is usually appropriate in the context of a traditional marriage where a spouse has surrendered economic opportunities and needs a period of time to get retooled to enter the work force."). Rather, Erinn's permanent disability prevents her from being capable of self-support—both now and in the future. As such, the spousal support award shall continue until Erinn's remarriage or the death of either party.

**IV. Conclusion.**

In light of the foregoing, we conclude a spouse's permanent disability suffered during the parties' marriage may be considered when determining a traditional spousal support award, even if the length of the parties' marriage does not quite meet the typical durational threshold. Based on a de novo review of the record, we further conclude that Erinn should be awarded traditional spousal support of $400 per month, but the amount should not increase upon the termination of Jason's child support obligation.

We remand for entry of a spousal support award consistent with this opinion, including a recalculation of Jason's past and future child support obligation so that spousal support can be taken into account pursuant to Iowa Court Rule 9.5.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT ORDER AFFIRMED AS MODIFIED AND REMANDED.**

All justices concur except Christensen, C.J., and May, J., who take no part.